IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHANTE DEMARIS FOLEY, | ) | CASE NO.  1:25-CV-00900-CEF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | JUDGE CHARLES E. FLEMING |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Shante Demaris Foley ("Plaintiff" or "Foley"), challenges the final decision of Defendant, Frank J. Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In May 2022, Foley filed an application for POD and DIB, alleging a disability onset date of March 22, 2022, and claiming she was disabled due to schizophrenia.  (Transcript ("Tr.") 59, 60, 64.)  The applications were denied initially and upon reconsideration, and Snay requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 74, 84, 89.)

---

[1] On May 7, 2025, Frank J. Bisignano became the Commissioner of Social Security.

1

On April 24, 2024, an ALJ held a hearing, during which Foley, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 40-58.)  On May 17, 2024, the ALJ issued a written decision finding Foley was not disabled.  (*Id*. at 17-35.)  The ALJ's decision became final on March 12, 2025, when the Appeals Council declined further review.  (*Id*. at 1.)

On May 5, 2025, Foley filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9.) Foley asserts the following assignments of error:

1) The ALJ erred when she failed to support her conclusions or discuss supportability or consistency when she evaluated the opinion of the treating source.

2) The ALJ erred at Step Three of the Sequential Evaluation when she failed to find that Plaintiff satisfied the criteria of Listing 12.03.

3) The ALJ erred when she failed to properly apply the criteria of Social Security Ruling 96-8p and consider Plaintiff's schizophrenia and related limitations when forming the RFC.

(Doc. No. 7 at 1.)

## II. EVIDENCE

### A.     Personal and Vocational Evidence

Foley was born in 1988 and was 35 years-old at the time of her administrative hearing (Tr. 59), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has a high school education.  (Tr. 34.)  She has past relevant work as cosmetic sales and demonstrator.  (*Id*.)

2

**B.      Relevant Medical Evidence[2]**

On August 18, 2021,[3] Foley presented with complaints of headaches occurring daily over the past three months. (Tr. 268.) She rated the pain as a nine out of ten. (*Id*.) The headaches lasted for about thirty minutes. (*Id*.) The headaches improved with laying down, eating, and drinking water. (*Id*.) The headaches were worse with stress, concentration, and after work. (*Id*.) She also experienced flashing lights in her vision and jerking motion in her back during the headaches. (*Id*.) She did not take any over the counter medication. (*Id*.) She denied auditory hallucinations. (*Id*.) She was prescribed a medication and referred for an MRI of her head/neck. (*Id*. at 269.)

On September 23, 2021, Foley presented for a virtual psychiatric evaluation. (*Id*. at 354.) She stated she started hearing voiced just over a year ago. (*Id*.) She endorsed visual hallucinations in the form of flashes of light and tactile hallucinations that occur at night. (*Id*. at 355.)  She explained it was helpful for her to keep busy. (*Id*.) She denied symptoms of depression and anxiety, reported getting adequate sleep, and continued interest and ability to concentrate. (*Id*.) She "has largely been able to function normally" including working at Sephora and for Estee Lauder and taking two classes at a community college. (*Id*.) Mental status exam revealed she was well-dressed with appropriate grooming and hygiene, good eye contact, unremarkable speech, full range affect with reactive laughing and smiling, euthymic mood, appropriate demeanor, organized, linear, and goal-directed thought content, auditory, visual, and tactile hallucinations, and appropriate insight and judgment. (*Id*. at 357.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] Both parties cite to medical evidence dated in 2021. (*See* Doc. No. 7 at 2 and Doc. No. 9 at 3.) These records pre-date Foley's alleged onset date and are thus of limited relevance. *Gore v. Comm'r of Soc. Sec.*, No. 5:20-CV-341, 2021 WL 3673196, at *4 (N.D. Ohio Aug. 19, 2021)(citing *Lorrison v. Berryhill*, No. 18-cv-10289, 2019 WL 1324247, at *6 (E.D. Mich. Mar. 25, 2019).

On November 18, 2021, Foley presented for a virtual psychiatric follow-up appointment. (*Id*. at 347.) She reported doing well since increasing her evening medication dose and taking the dose earlier in the evening. (*Id*. at 348.) She continues to experience auditory hallucinations, but they have lessened. (*Id*.) She noted she can go to work without distraction and the voices are "less severe when her mind is kept occupied by something else." (*Id*.) She continues to experience tactile hallucinations at night, but they do not occur daily. (*Id*.) She denies depression, and reports appropriate sleep, concentration, energy, and interest in daily activities. (*Id*.) She continues to do well at both school and work. (*Id*.)

On December 15, 2021, Foley presented for a virtual counseling appointment. (*Id*. at 346.) She reported hearing voices. (*Id*.) She explained her medication helps calm her down and when it wears off "the voices get meaner." (*Id*.) Mental status exam revealed appropriate appearance, relaxed and engaged behavior, unremarkable speech, neutral mood, appropriate affect, unremarkable thought content and perception, and appropriate insight and judgment. (*Id*. at 346-47.)

On December 23, 2021, Foley presented for a virtual psychiatric follow-up visit. (*Id*. at 340.) She reported doing well, "noting that the auditory hallucinations remain relatively quiet and are not distracting for most of the day." (*Id*.) She notes the medication helps. (*Id*.) She denies medication side effects. (*Id*.) She reported tactile hallucinations typically occur overnight or in the early hours of the morning. (*Id*.) Mental status exam revealed appropriate and neat appearance, good eye contact, unremarkable speech and motor activity, full range affect, euthymic mood, appropriate and cooperative demeanor, unremarkable thought process, auditory hallucinations (not disruptive to functioning), intermittent tactile hallucinations (not currently present), fully oriented, and appropriate insight and judgment. (*Id*. at 341.)

On December 23, 2021, Foley presented for a phone visit with a nurse. (*Id*. at 343.) She reported continued tactile hallucinations at night. She explained her focus is "on and off" and better in the afternoon. (*Id*.) She reported good sleep, getting eight or more hours. (*Id*.) Mental status exam revealed generally

4

relaxed and engaged behavior, unremarkable speech, neutral mood, appropriate affect, tactile hallucinations, and no symptoms of anxiety or depression. (*Id*.)

On January 27, 2022, Foley presented for a virtual psychiatric follow-up visit. (*Id*. at 336.) She noticed a decrease in tactile hallucinations over the last week but continued to experience intermittent auditory hallucinations. She stated the hallucinations were less frequent and decreased in intensity since starting medication. (*Id*.) She denied symptoms of depression and anxiety. (*Id*.) Mental status exam revealed appropriate and neat appearance, good eye contact, unremarkable motor activity and speech, full range affect, happy mood, appropriate and cooperative demeanor, goal-directed and linear thought process, intermittent auditory hallucinations, alert, fully oriented, appropriate insight and judgment. (*Id*. at 337.) The provider assessed Foley with unspecified psychosis and wrote that her symptoms have caused her distress for more than a year yet does not seem to have "caused any significant decrease in the patient's functioning." (*Id*.) She balanced work and school at the time, even prior to starting medication. (Id.) Foley was advised to continue medications and attend therapy. (*Id*. at 338.)

On April 14, 2022, Foley presented for a virtual psychiatric follow-up visit. (*Id*. at 329.) She reported "doing well overall", resolution of tactile hallucinations, intermittent auditory hallucinations, but explained that they don't bother her. (*Id*.) She reported difficulty falling asleep and denied feeling depressed. (*Id*.) Mental status exam revealed appropriate, neat, and well-groomed appearance, good eye contact, unremarkable motor activity and speech, full range affect, euthymic mood, unremarkable thought content, auditory hallucinations, appropriate demeanor, insight, and judgment. (*Id*. at 330.)

On September 15, 2022, Foley presented for a telephone nurse visit. (*Id*. at 327.) She reported poor sleep since starting medication, good focus, motivation "comes and goes", and denied symptoms of depression, anxiety, and hallucinations. (*Id*.) Mental status exam revealed cooperative behavior, unremarkable speech, neutral mood, appropriate affect, and unremarkable perception. (*Id*. at 328.)

5

On September 15, 2022, Foley presented for a virtual psychiatric follow-up visit. (*Id*. at 307.) She reported doing well overall but continued to have poor sleep. (*Id*.) She reported a stable mood and coping with her audio hallucinations. (*Id*.) She denied tactile or visual hallucinations. (*Id*.) She sleeps about 4 hours most nights. (*Id*.) She recently started working at Ulta and greatly enjoys it. (*Id*.) She reported running out of her medications. (*Id*.) Mental status exam revealed neat appearance, well-groomed, good eye contact, full range affect, sad mood, unremarkable thought content, unremarkable and goal-directed thought process, auditory and tactile hallucinations, alert attention, appropriate demeanor, judgment, and insight. (*Id*. at 307-8.) She was diagnosed with psychosis. (*Id*. at 308.) Her medications were continued. (*Id*.)

On December 8, 2022, Foley presented for a virtual psychiatric follow-up visit. (*Id*. at 320.) She reported having a stressful two months due to her mother's health concerns, she works at Ulta and enjoys it, she hears voices and is working on managing them, her mood is improved, and she sleeps well most nights. (*Id*.) Mental status exam revealed appropriate, neat, and well-groomed appearance, good eye contact, unremarkable speech and motor activity, full range affect, euthymic mood, unremarkable thought content and thought process, auditory hallucinations, appropriate demeanor, insight, and judgment. (*Id*. at 321.)

On January 5, 2023, Foley presented for a virtual psychiatric follow-up visit. (*Id*. at 315.) She reported doing ok, having some days with low mood, and rated her worst days as a six out of ten, with ten being the worst. (*Id*.) She reported getting decent sleep, continuing auditory hallucinations, and worsening concentration. (*Id*. at 315-16.) Mental status exam revealed appropriate, neat, and well-groomed appearance, good eye contact, unremarkable motor activity and speech, full range affect, euthymic mood, unremarkable thought content and thought process, auditory hallucinations, and appropriate demeanor, insight, and judgment. (*Id*. at 317.) Her medication was adjusted to address the worsening concentration and memory side effects. (*Id*.)

On March 2, 2023, Foley presented for a virtual psychiatric follow-up visit. (*Id*. at 306.) She reported that her mother passed away the day before. (*Id*.) She reported feeling supported by family and friends. (*Id*.) She reported her concentration and focus "remain improved" and has been sleeping well. (*Id*.) She reported re-emergence of tactile hallucinations over the past several weeks after not experiencing them for some time. (*Id*.) She stated this is mild and agreed to monitor the hallucinations. (*Id*.)

On May 18, 2023, Foley presented for a physical exam. (*Id*. at 524.) She reported doing well mental health wise, working with a psychiatrist and weaned off all medications, and denied recent headaches. (*Id*.) She stated she works at Ulta Beauty. (*Id*.)

On June 1, 2023, Foley presented for a virtual psychiatric follow-up visit. (*Id*. at 409.) She reported not doing well. (*Id*.) She stated she constantly sees "images of people and hallucinations" and was struggling to go to work or leave the house. (*Id*.) She was interested in resuming medication. (*Id*.) She stated she was moving into a new house with her brother and father and was excited for that. (*Id*.)

On July 12, 2023, Foley presented for an appointment with a social worker, stating she needs a case manager to help with applying for food stamps and disability. (*Id*. at 403.) She reported feeling sad, hopelessness due to getting used to her medication, loss of interest, insomnia, and lack of motivation. (*Id*. at 405.) She explained she feels depressed when she is off her medications. (*Id*.) She stated she has some days when she feels fine and other days that are difficult. (*Id*.) Her symptoms got worse after her mom died. (*Id*.) Medication helps her depression symptoms, but she still hears voices even when she takes her medication. (*Id*.) Mental status exam revealed appropriate appearance, good eye contact, unremarkable motor activity and speech, full affect, euthymic mood, depressive thought content, unremarkable thought process, alert attention, appropriate demeanor, insight, and judgment. (*Id*. at 406.) She was referred to psychiatry. (*Id*. at 407.)

On July 17, 2023, Foley presented for a virtual psychiatric follow-up appointment. (*Id*. at 614.) She reported feeling "pretty stable" prior to March 1, when her mom passed away. (*Id*.) Her hallucinations "ramped up." (*Id*.) Mental status exam revealed neat appearance, good eye contact, unremarkable speech and motor activity, full range affect, euthymic mood, unremarkable thought content, linear thought process, visual, auditory, and tactile hallucinations, appropriate demeanor, insight, and judgment. (*Id*. at 616.) Her medications were adjusted. (*Id*. at 617.)

On September 25, 2023, Foley presented for psychiatric follow-up appointment. (*Id*. at 609.) She reported auditory, visual, and tactile hallucinations that are worse at night. (*Id*.) She reported insomnia, increased appetite, and mental tiredness. (*Id*.) She stated she continues to work at Ulta and it is going well. (*Id*.) Mental status exam revealed neat appearance, rocking back and forth, unremarkable speech, full range affect, euthymic mood, unremarkable thought content, goal-directed thought process, tactile, auditory, and visual hallucinations, appropriate demeanor, insight, and judgment. (*Id*. at 610.)

On September 28, 2023, Foley completed Function Report – Adult. (*Id*. at 210.) She reported hearing voices and experiencing visual and tactile hallucinations. (*Id*.) She endorsed insomnia, depression, paranoia, and lack of motivation. (*Id*.) She reported working part time and other days trying to get some rest due to insomnia. (*Id*. at 215.) She helps take care of a pet cat by feeding it and providing water. (*Id*.) Her step-dad and brother also help care for the cat. (*Id*.) Her ability to focus, memory, and motivation were better before her illness. (*Id*.) She reported having trouble bathing and wearing the same clothes and is able to feed herself and toilet herself. (*Id*.) She stated she can make basic meals daily. (*Id*. at 216.) She can make her bed, sweep the floor, wash dishes, and do laundry. (*Id*.) She needs encouragement to clean her room and do laundry. (*Id*.) She reported being able to do housework, it "just takes time." (*Id*.) She stated she leaves the house four days per week. (*Id*. at 217.) She walks or takes public transportation. (*Id*.) She usually walks with someone and uses public transportation alone. (*Id*.) Once a week she shops in stores for groceries and personal

8

hygiene products. (*Id*.) She reported being able to pay bills and count change. (*Id*.) She does not have a savings account or use a checkbook. (*Id*.) Her ability to handle money has not changed since onset of symptoms. (*Id*.) Her hobbies and interests include reading and watching movies, which she does every day. (*Id*. at 218.) She goes to Kingdom Hall twice per week to volunteer. (*Id*.) She does not have problems getting along with people but does not talk to friends like she used to. (*Id*.) Her reported her memory, concentration, understanding, and ability to follow instructions are impaired by her illness. (*Id*. at 219.) She estimates she can pay attention for 30 minutes. (*Id*.) She "does well" with written instructions and struggles with verbal instructions. (*Id*.) She gets along "pretty well" with authority figures and has never been fired or laid off because of problems getting along with others. (*Id*.) She handles stress and changes in routine "okay". (*Id*. at 220.) She takes medications for her audio hallucinations and restlessness. (*Id*. at 221.)

On November 13, 2023, Foley presented for a psychiatric follow-up appointment. (*Id*. at 602.) She endorsed worsening hallucinations, restless legs, and feeling depressed. (*Id*.) The hallucinations interfered with her ability to go to work. (*Id*.) Mental status exam revealed appropriate and well-coiffed appearance, poor eye contact, unremarkable motor activity, soft speech, constricted affect, anxious mood, depressive cognitions, goal-directed thought process, hallucinations, cooperative and anxious demeanor, and fair insight. (*Id*. at 603.) Her medications were adjusted. (*Id*. at 605.)

On November 27, 2023, Foley presented for a psychiatric follow-up appointment. (*Id*. at 597.) She arrived with her grandmother. (*Id*.) She reported not meeting work expectations due to confusion, grogginess, fatigue, and lightheadedness. (*Id*.) She reported being on one medication for only three days and not yet picking up a different medication. (*Id*.) Mental status exam revealed appropriate appearance, poor eye contact, restless motor activity, unremarkable speech, constricted affect, nervous mood, goal-directed thought process, hallucinations, distracted attention, cooperative demeanor, appropriate insight, and fair judgment. (*Id*. at 598.)

9

On November 27, 2023, Olivia Dahl, M.D., completed a Mental Impairment Questionnaire. (*Id*. at 439.) Dr. Dahl wrote Foley was diagnosed with schizophrenia and taking medications that could cause drowsiness, dizziness, and increased need for bathroom visits. (*Id*.) Dr. Dahl's clinical findings include confusion, slow replies, disorganization, and poverty of speech. (*Id*.) Dr. Dahl expected "significant impairment" over the next six months, and indicated the impairment has lasted or could be expected to last twelve months. (*Id*.) Dr. Dahl indicated Foley would be unable to meet competitive standards in following areas: managing regular attendance and be punctual within customary tolerances, work in coordination with others without being distracted by them, complete a normal workday and workweek without interruptions from symptoms, and perform at a consistent pace without unreasonable rest periods, remember locations and work-like procedures, understand and remember detailed instructions, and set realistic goals or make plans independently. (*Id*. at 439-440.) She indicated Foley would be "seriously limited but not precluded" in the following areas: carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, understand and remember short and simple instructions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id*.) She indicated Foley would be "limited but satisfactory" in carrying out short and simple instructions, sustaining an ordinary routine without special supervision, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id*.) Dr. Dahl opined Foley would be absent from work due to her impairment four days per week and would be off task eighty percent of the day. (*Id*. at 440.)

On November 29, 2023, presented for an office visit due to worsening multisensory hallucinations. (*Id*. 460.) Her primary diagnosis was psychosis. (*Id*.) She reported not working since mid-October due to feeling anxious, mentally tired, trouble sleeping, and feeling fatigued. (*Id*. at 461.)

10

On February 5, 2024, Foley presented for a psychiatric follow-up. (*Id.* at 591.) She reported medication helping with hallucinations, thought she continues to see things and hear voices. (*Id.*) She reports restless legs that sometimes wake her up. (*Id.*) Mental status exam revealed appropriate appearance, poor eye contact, restless motor activity, unremarkable speech, constricted affect, "ok" mood, no suicidal ideations, goal-directed thought process, perceptual disturbances, cooperative demeanor, appropriate insight, and fair judgment. (*Id.* at 592.)

On March 26, 2024, Foley's step-father completed Function Report – Adult – Third Party. (*Id.* at 251.) He wrote Foley lacks focus, experiences insomnia, and tiredness. (*Id.* at 252.) He stated that he buys cat food and cares for the cat. (*Id.*) He specified Foley could work six-hour shifts at her job before her illness and can no longer do that. (*Id.*) He claims the medication she takes causes insomnia. (*Id.*) He stated she needs to bathe more often and improve her dress but not wearing the same clothes every day. (*Id.* at 253.) She is able to cook and wash dishes. (*Id.*) She often sleeps during the day, but goes outside twice per week. (*Id.* at 254.) She grocery shops once per month. (*Id.* at 254.) She is able to handle a savings account, count change, and use a checkbook. (*Id.* at 254-55.) She enjoys watching videos, reading, and listening to music. (*Id.* at 255.) She goes to Kingdom Hall twice per week. (*Id.*) She gets along with others but spends more time alone since the onset of her illness. (*Id.*) He wrote her illness effects bending, kneeling, hearing, memory, completing tasks, concentration, understanding, and following instructions. (*Id.* at 256.) He opined she can pay attention for about ten minutes, can finish what she starts, may struggle with written instructions, "really struggles with spoken instructions", gets along with people, has never been fired or laid off due to inability to get along with others, handles stress ok, and may struggle with changes in routine "at first". (*Id.*) He wrote she takes medications for symptoms which cause insomnia, restless leg syndrome, and jerking. (*Id.* at 257.)

11

## C.      State Agency Reports

### 1.      Mental Impairments

On May 19, 2023, Janet Souder, PsyD., reviewed the claim file and wrote there was insufficient evidence, and she needed additional information to fully assess the allegations and functioning. (*Id*. at 60.)

On October 12, 2023, on reconsideration, Larry Kravitz, PsyD., reviewed the claim file and opined that Foley had moderate limitations to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and to adapt or manage herself. (*Id*. at 67.)

## D.      Hearing Testimony

During the April 24, 2026 hearing, Foley testified to the following:

> • She worked at Macy's in 2021 as a beauty advisor for Estee Lauder. (*Id*. at 47.) In this role, she would help people find products, suggest products, clean, stock, use the register, and count money. (*Id*. at 48.) She would teach people how to use products and persuade them to make purchases. (*Id*.) She was paid an hourly wage and commission. (*Id*. at 48-49.) She had to lift or carry 20 pounds. (*Id*. at 49.) In 2022, she started working at Ulta. (*Id*.) She was paid hourly without commission. (*Id*.) She stopped working at Ulta due to experiencing bad schizophrenia symptoms. (*Id*. at 49-50.) Her symptoms started to get worse after her mom passed away. (*Id*. at 50.)

> • She experiences paranoia, lack of sleep, and hallucinations. (*Id*. at 51.) She experiences tactile hallucinations where she feels like someone is touching her. (*Id*.) She also hears voices that say mean things and make it hard for her to focus. (*Id*.) It is hard for her to function at work due to hearing the voices. (*Id*.) She cannot focus at home to do things like taking a bath or chores. (*Id*.) She had trouble finishing a project at work and interacting with others because she couldn't focus. (*Id*. at 51-52.) There were two times she had to take a break at work due to symptoms. (*Id*. at 52.) There were times that she called off work due to symptoms, including being unable to focus and get out of bed. (*Id*.)

> • She likes to watch TV and movies but if she is sitting for too long, she experiences tactile hallucinations. (*Id*.) She lives with her stepfather and stepbrother. (*Id*. at 53.) She has no difficulties interacting with her family members. (*Id*. at 53-54.) The hallucinations make it difficult to be in public because sometimes she jerks or shakes. (*Id*. at 54.) She is a Jehovah's Witness and attends meetings twice per week. Sometimes she jerks or shakes during the meetings. (*Id*.)

12

> • She does not get much sleep because she jerks and shakes. (*Id*. at 54.) She thinks one of her medications gives her restless leg syndrome. (*Id*.) She has difficulty both falling asleep and staying asleep. (*Id*. at 55.) She estimates she sleeps two to three hours. (*Id*.)

The VE testified Foley had past work as a cosmetic demonstrator and cosmetic sales.  (*Id*. at 55.)

The ALJ then posed the following hypothetical question:

> Hypothetical number one, no exertional limitations. This individual can understand, remember, and apply information to complete simple and detailed instructions, can exercise judgment to make up to occasional decisions in work duties.
>
> Can interact with general public, coworkers, and supervisors for work tasks that are -- work tasks that do not require directing the work of others or resolving conflicts between parties. As you review this hypothetical individual, can you tell me whether or not this individual could return to the claimant's past work?

(*Id*. at 55-56.) The VE testified the hypothetical individual would not be able to perform Foley's past work as a cosmetic demonstrator and cosmetic sales.  (*Id*. at 56.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as Cleaner II, Industrial Cleaner, and Store Laborer. (*Id*. at 56.)

The ALJ asked:

> Hypothetical number two, if I change only to the work tasks being routine in nature with up to occasional -- I'm sorry. That's not really change only. We're going to say can work at tasks that are routine in nature and can adapt to up to occasional changes in work duties and work environments. How does that impact your answer?

(*Id*. at 56.) The VE testified that the same jobs provided in response to hypothetical one would remain. (*Id*.) Foley's attorney asked the VE, if someone needed an isolated work environment, whether that would be consistent with competitive work or an accommodated work setting. (*Id*. at 57.) The VE responded that that would not be consistent with competitive employment. (*Id*.) The attorney asked about absenteeism, and the VE testified that an employer would tolerate arriving late, leaving early, or being absent, once per month.

13

(*Id*.) The VE explained that two or more consistently would result in reprimand and termination. (*Id*.) The VE testified that being off task 15 percent or more of the workday would be work preclusive. (*Id*.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not

14

prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Foley was insured on the alleged disability onset date, March 22, 2022, and remains insured through June 30, 2026, the date last insured ("DLI").  (Tr. 59.) Therefore, in order to be entitled to POD and DIB, Foley must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2028.

2. The claimant has not engaged in substantial gainful activity since March 22, 2022, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairment: schizophrenia (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can understand, remember, and apply information to complete simple and detailed instructions; she can exercise judgment to make up to occasional decisions in work duties; and she can interact with the general public, co-workers, and supervisors for work tasks that do not require directing the work of others or resolving conflicts between parties.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on June 24, 1988, and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 22, 2022, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-35.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

16

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734,

17

2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.     Opinion Evidence.

In her first assignment of error, Foley argues the ALJ erred by failing to discuss the supportability and consistency factors when evaluating Dr. Dahl's opinion. (Doc. No. 7 at 7, 9.) Foley states the ALJ finding the opinion not persuasive is "neither supported by nor consistent with the medical records". (*Id*. at 9.) Foley states all medical providers reported hallucinations. (*Id*. at 9-10.) Foley claims the ALJ found the opinion not persuasive because it "largely overestimates" Plaintiff's limitations, and referenced the ALJ's analysis under Step Three of the sequential evaluation. (*Id*. at 10.) Foley states the analysis is lengthy but redundant, and the ALJ's finding that Foley had hallucinations but failed to adopt the findings of Dr. Dahl render the opinion not supported and not consistent with the medical records. (*Id*. at 10.) Foley claims the ALJ failed "to support her determination regarding the persuasiveness of this opinion necessitating a remand of this matter." (*Id*. at 11.)

Foley argues the ALJ finding the state agency medical consultant opinion on reconsideration partially persuasive but then concluding in the RFC that Foley could interact with the general public, co-workers, and supervisors, was contrary to that opinion, and thus, the ALJ failed to support her findings with evidence from the record. (*Id*. at 11.) Foley states the ALJ's finding of the state agency medical consultant's opinion was not supported by or consistent with the record, requiring remand. (*Id*.)

In response, the Commissioner states Foley's argument regarding the evaluation of Dr. Dahl's opinion is a request that the Court reweigh the evidence. (Doc. No. 9 at 16.) The Commissioner asserts the ALJ properly evaluated Dr. Dahl's opinion, discussing both consistency and supportability. (*Id*.) The Commissioner argues the ALJ explained Dr. Kravitz used vague terms that overestimated Foley's

18

limitations, and the ALJ used vocationally relevant terms for the limitations provided in the RFC. (*Id*. at 17-18.) The Commissioner asserts the ALJ properly defined the term "superficial" as it related to Dr. Kravitz's finding Foley was limited to superficial interactions. (*Id*. at 18.)

Since Foley's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

19

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.
>
> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20

20

C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion."  *Id.*

The ALJ analyzed Dr. Dahl's opinion as follows:

> The undersigned is not persuaded by the opinion of the claimant's mental health provider, Olivia Dahl, M.D., who opined that the claimant would be unable to meet competitive standards as it relates to understanding, remembering, or applying information; seriously limited in her ability to interact with others; and unable to meet competitive standards or seriously limited in concentrating, persisting, or maintaining pace, and in adapting of managing oneself. She also opined that the claimant would be absent from work up to 4 days per week and would be off task 80% of the workday (6F). The undersigned is not persuaded by this opinion because it is not entirely supported by her examinations of the claimant. For example, the claimant's initial evaluation with Dr. Dahl was almost entirely unremarkable aside from the claimant's reports of symptoms (8F/24-28). At a virtual visit a month later, the only remarkable finding was some restlessness on Zoom (8F/19-23). The remarkable findings at other examinations were in the context of changes in medication to address the claimant's reports of symptoms, and even the claimant reported improvement in her hallucinations (8F/1-6). The examinations do not support more than fair or moderate limitations in the areas of mental functioning. The opinion also is not consistent with the more complete medical record (e.g., the persuasive portions of the state agency psychological consultants' opinion above; and the combination of remarkable and unremarkable examination findings noted above) because it generally overestimates the claimant's mental functional limitations. There also is no evidence to support the level of absenteeism or off-task behavior opined by Dr. Dahl, either. Because it largely overestimates the claimant's limitations, and the more complete record supports that the claimant's limitations are no greater than those outlined in the *Paragraph B Criteria* findings and in the residual functional capacity finding, the undersigned is not persuaded by this opinion.

(Tr. 33.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. § 404.1520c(a). The ALJ considered the supportability and consistency of Dr. Dahl's opinions, discussing how Dr. Dahl's examinations of Foley do not support her findings, including many nearly unremarkable findings, aside from reports of symptoms, restlessness, medication side effects, and even improvement in symptoms from medications. (Tr. 33.) The ALJ

21

considered the consistency of the opinion, noting that it "is not consistent with the more complete medical record", including the state agency consultant's opinion and the combination of both remarkable and unremarkable examination findings. (*Id.*) The ALJ noted there is no evidence supporting the level of absenteeism or off-task behavior noted by Dr. Dahl. (*Id.*)  The ALJ properly considered the supportability and consistency factors when analyzing Dr. Dahl's opinion. There is no error.

The ALJ analyzed Dr. Kravitz's opinion, in part, as follows:

> . . . The undersigned finds this opinion partially persuasive in that finding the claimant has moderate limitations in each of the areas of mental functioning is supported by the evidence the consultant reviewed, including the remarkable findings related to mood and affect around significant events (e.g., the passing of her mother (2F/5, 9-14; 5F/22-32); being off medication (5F/11-21)) or otherwise (e.g., 5F/4-10)), the otherwise unremarkable examinations with regard to her ability to interact with others (e.g., 2F/14-30, 35-49), reports of hallucinations impacting her attention and concentration although her examinations in this regard were otherwise unremarkable (e.g., 5F/4-10; 8F/24-28 (07/17/23)), and examinations where her insight and judgment generally were appropriate or unremarkable (e.g., 2F/9-14, 19-28, 35-49, 53-61; 5F/4-10, 27-32), but the claimant still experienced hallucinations and had stopped taking her medication at some point (5F/16-21). These findings as to the degree of limitation are also consistent with the other evidence in the record (e.g., memory grossly intact at 8F/1-16, 24-28; additional remarkable findings related to mood and affect (e.g., 8F/7-28), but also unremarkable findings (e.g., 7F/84-89; 8F/19-23); findings of restlessness (e.g., 8F/1-11, 19-23) and distraction (8F/1-11), but otherwise unremarkable attention and concentration (e.g., 8F/24-28); and fair insight and/or judgment (e.g., 8F/1-16)). However, the opinion used vague imprecise terminology that was not defined or explained nor is it used by the DOT to describe work tasks, skills or environments. These vague terms also indicate opinions that overestimate the claimant's corresponding limitations insofar as the record does not support limiting the claimant to only simple tasks and to brief and infrequent interactions with others.

***

> As to her interaction with others, the claimant testified that she does not have difficulty interacting with the public, but her other symptoms (e.g., jerking, shaking) have impacted her ability to interact with others on occasion; and there were two times she recalled that she had to take a break or be away from others to manage her symptoms. As noted above, while she had some remarkable findings related to mood and affect around

22

significant events (e.g., 2F/5, 9-14; 5F/411-21, 22-32) and a few other times (e.g., 5F/4-10; 8F/7-28), her examinations were otherwise unremarkable with regard to her ability to interact with others (e.g., 2F/14-30, 35-49; 7F/84-89; 8F/19-23). Moreover, the opinion is also vague in its articulation of some of the claimant's limitations. With respect to specific mental functional limitations, the undersigned utilized more vocationally relevant terminology when articulating the claimant's specific mental functional limitations. In particular, the consultant did not define "superficial," but the residual functional capacity limitation that the claimant can perform work that does not require directing the work of others or resolving conflicts between parties sufficiently address limitations in the nature of the claimant's interactions with others.

(Tr. 32-33.) Here, the ALJ considered both the supportability and consistency of Dr. Kravtiz's opinion, finding the moderate limitations supported by the evidence reviewed by Dr. Kravitz and finding the degree of limitation consistent with other evidence in the record. (*Id*. at 32.) Further, the ALJ noted Dr. Kravitz did not use vocationally relevant terms, including the term "superficial." (*Id*.) The ALJ stated that the limitation provided in the RFC limiting Foley to perform work that does not require directing the work of others or resolving conflicts between parties properly addresses Foley's limitations in interacting with others. (*Id*. at 32-33.) This Court has found that ALJ need not explain why they defined "superficial" they way they did, only that they explain why the claimant is limited to superficial interaction the way the ALJ defined it and that the record not be clearly contrary to that definition. *Adams v. Comm'r of Soc. Sec.*, No. 1:22-CV-01765-DAC, 2023 WL 4685368, at *9 (N.D. Ohio July 21, 2023). The ALJ discussed both the supportability and consistency of Dr. Kravtiz's opinion, defined the vocational term "superficial" and explained how the evidence supports Foley's superficial limitation to interacting with others. There is no error.

## B.     Medical Listings.

In her second assignment of error, Foley argues the ALJ erred by failing to find Foley satisfied the criteria of Listing 12.03. (Doc. No. 7 at 12.) Foley points out that her severe impairment is schizophrenia, that the ALJ considered Listing 12.02, which addresses neurocognitive disorders, but Listing 12.03 addresses schizophrenia. (*Id*. at 12.) Foley argues the ALJ erred by finding Foley had moderate limitations

23

in the Paragraph B criteria. (*Id*. at 13.) Foley contends the ALJ citing to the fact that Foley could perform some activities was error. (*Id*. at 15.) Foley claims the ALJ failed to consider the combination of paranoia and hallucinations, and "the totality of the evidence", when she determined Foley could engage in full-time sustained work activity, meaning the ALJ did not support her "Part B" analysis. (*Id*. at 15-16.) Foley states the ALJ "did not consider the effect of the combination of Plaintiff's psychological symptoms . . ." (*Id*. at 17.)

The response, the Commissioner argues "substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or medically equal a listing." (Doc. No. 9 at 8.) The Commissioner states the ALJ's decision was consistent with the PAMFs of state agency psychologist, which in itself constitutes substantial evidence to find a claimant has not met a listing. (*Id*. at 8-9, citing *Stiefel v. Comm'r of Soc. Sec. Admin.*, 2022 WL 2870901, at *2 (N.D. Ohio July 21, 2022).) The Commissioner points out that the paragraph B criteria for Listing 12.02 and Listing 12.03 are the same, thus, the ALJ's analysis of paragraph B criteria for Listing 12.02 instead of Listing 12.03 is harmless error. (*Id*. at 9, citing *Parsons v. Comm'r of Soc. Sec.*, No. 1:18-CV-02881, 2020 WL 512107, at *2 (N.D. Ohio Jan. 31, 2020).) The Commissioner contends Foley is asking the Court to reweight the evidence the ALJ cited in her paragraph B analysis, and that mentioning Foley's activities shows her level of activity, which is a proper consideration. (*Id*. at 10-12.)

"If a claimant meets or equals the requirements of a listed impairment, then the claimant is considered disabled." *Fitzenreiter v. Comm'r of Soc. Sec.*, No. 3:16 CV 2442, 2018 WL 372759, at *9 (N.D. Ohio Jan. 10, 2018), citing 20 C.F.R. §§ 416.920(d); 404.1520(d). In order to determine whether a claimant's impairment meets a listing, the ALJ may consider all evidence in a claimant's record. *See* 20 C.F.R. §§ 404.1520(a)(3); 404.1526(c). A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that he is disabled at Step Three of the sequential evaluation process. *See* 20

24

C.F.R. §§ 404.1520, 416.920; *Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir. 1986). The claimant has the burden to prove all the elements are satisfied. *King v. Sec'y of Health & Human Servs.,* 742 F.2d 968, 974 (6th Cir. 1984). Moreover, "[t]he burden of providing a ... record ... complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986). It is not sufficient to come close to meeting the conditions of a Listing. *See, e.g., Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir. 1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

> To meet or equal paragraph B, an individual's mental disorder must result in an extreme limitation of one, or a marked limitation of two, of the four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.

*Milliken v. Comm'r of Soc. Sec.*, No. 3:22-CV-01219, 2023 WL 3571117, at *10 (N.D. Ohio May 3, 2023), *report and recommendation adopted,* No. 3:22 CV 1219, 2023 WL 3569072 (N.D. Ohio May 19, 2023), citing 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A)(2)(b).

The ALJ considered Foley's mental impairments at step three, writing in part, "[t]he severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.02.[6] In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied." (Tr. 20.) The ALJ went on to devote nearly four single spaced pages solely to her paragraph B criteria analysis. (*Id*. at 20-24.) She considered Foley's daily activities and abilities, including the need for reminders to take care of personal needs and grooming, her ability to care for a pet, take public transportation alone, shop in stores, and engage in hobbies. (*Id*. at 20-21, 23, 24.) The ALJ also considered the results of mental status exams showing some

---

[6] The ALJ considered listing 12.02, for neurocognitive disorders, instead of listing 12.03, the listing for schizophrenia. (Tr. 20.) Courts have held that failure to consider a particular listing is harmless where, as here, the paragraph B criteria is the same for each listing. *See Parsons*, 2020 WL 512107, at *2. Because the paragraph B criteria is the same for both listing 12.02 and 12.03 (*see* 20 C.F.R. Pt. 404, Subpt. P. App. 1, §§ 12.02 and 12.03), and meeting the paragraph A criteria was not at issue, the error is harmless.

deficits in memory as a medication side effect but otherwise grossly intact memory, and no more than a fair or moderate degree of limitation in interacting with others and concentrating, persisting, or maintaining pace. (*Id*. at 21, 22.) The ALJ cited the state agency psychological consultant opinion, finding moderate limitations in each of the paragraph B criteria. (*Id*. at 21, 22, 23, 24.)

Here, the ALJ considered both evidence of mental health challenges as well as unremarkable findings. (*Id*. at 20-24.) After weighing the evidence over the course of several pages, the ALJ wrote, "[b]ecause the claimant's mental impairment does not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." (*Id*. at 24.) The ALJ properly considered the evidence and found Foley had moderate limitations in each of the paragraph B areas of mental functioning. (*Id*.) While Foley would classify her impairments differently, it is not the Court's job to do so on appeal. *Ealy*, 594 F.3d at 512 ("[The] Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards."). It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here. While Foley would weigh the evidence differently, it is not for the Court to do so on appeal.

The ALJ, in analysis of each of the paragraph B criteria, relied in part on the opinion of the state agency psychological consultant. For that reason alone, the opinion that Foley did not meet a listing is supported by substantial evidence. *See Stiefel*, at *2 ("state agency opinions are substantial evidence to support the finding that a claimant has not met a listing.")

There is no error.

## C.      RFC Determination.

In her third assignment of error, Foley argues the ALJ erred by failing "to properly apply the criteria of Social Security Ruling 96-8P and consider Plaintiff's schizophrenia and related limitations when forming the RFC." (Doc No. 7 at 18.)  Foley contends the ALJ "failed to consider any effects related to Plaintiff's

continuing hallucinations and paranoia." (*Id*. at 20.) Foley states the ALJ did not consider evidence of Foley's paranoia and hallucinations when forming the RFC, rendering the RFC not supported by substantial evidence. (*Id*. at 21.) Foley claims "[t]here was an insufficient analysis of the evidence" requiring reversal. (*Id*. at 22.)

In response, the Commissioner argues the ALJ considered Foley's schizophrenia and related symptoms in forming the RFC. (Doc. No. 9 at 19.) The Commissioner contends the opinion is supported by substantial evidence, including Foley's activities of daily living, remarkable and unremarkable mental examinations, and other evidence including the PAMFs. (*Id*. at 19-20.) The Commissioner asserts the ALJ's reliance in part on Dr. Kravitz's opinion when forming the mental RFC constitutes substantial evidence. (*Id*. at 20.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at

*7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

In the RFC analysis, the ALJ considered Foley's hallucinations and paranoia. (Tr. 26-30.) The ALJ wrote, in part:

> She experiences paranoia, has auditory hallucinations (e.g., hearing voices telling her to hurt herself), and has tactile hallucinations. The hallucinations make it difficult for her to focus on tasks at work and at home (e.g., bathing, performing household chores) and needs encouragement to do these things. She reported that she can pay attention for 30 minutes. She has difficulty with spoken instructions. She testified about an instance at work where she could not finish a project due to her symptoms. There were two times she recalled that she had to take a break or be away from others to manage her symptoms. She also has missed work due to her symptoms. If she sits down for too long or engages in an activity for too long (e.g., watching television or movies), she has tactile hallucinations. She lives with her stepbrother and stepfather and interacts with them; she testified that she does not have difficulty interacting with the public, but her other symptoms (e.g., jerking, shaking) have impacted her ability to interact with others. She has difficulty sleeping, as well, in part because of side effects from her medication. Her symptoms worsened after her mother passed away (Testimony; 8E/1, 7, 10).

\*\*\*

> The record supports that the claimant has experienced functional limitations related to schizophrenia. The claimant received specialized treatment, including psychiatric medication management and therapy. However, despite some remarkable reports to providers and occasional remarkable examination findings, the claimant's examinations were largely unremarkable. Although the record reflects several adjustments in the claimant's medications to address her reports of symptoms, the evidence demonstrates that her symptoms are largely controlled with medication.

\*\*\*

> The claimant sought counseling services in August of 2021, reporting irritability, nervousness, racing thoughts, euphoria, hallucinations, and nightmares. She also reported hearing voices that harassed her, which had started a year prior, and they caused difficulty concentrating.

(*Id*. at 26, 27.) The ALJ wrote, regarding Foley's hallucinations and paranoia, "[s]he also underwent a psychiatric evaluation in September of 2023, where she made similar reports regarding auditory hallucinations. She also reported having a reactionary 'jerking' motion of her body, visual and tactile hallucinations, and feelings of paranoia" (*id*. at 28); "[a]bout a month later, the claimant reported that the

29

medication was helping, but not eliminating, her hallucinations, and the medication made her feel tired" (*id.*); "[i]n March of 2022, she reported worsening tactile hallucinations, but otherwise, her medication was abating her symptoms" (*id.*); "[s]everal months later, the claimant still reported difficulty sleeping, but her focus was good, and her symptoms of anxiety, depression, and hallucinations were well controlled" (*id.*); "[t]he next month, she reported doing better overall with notable improvement in her focus with the change in medication; her mood was sad relative to life stressors with her mother's health, and she reported some re-emergence of tactile hallucinations, but the rest of her examination was unremarkable" (*id.*); "[w]ith the change in medication, her mood was still sad, her tactile and visual hallucinations worsened, and she reported being increasingly distracted, but she was sleeping better" (*id.*); "[b]ut at a mental health appointment a few weeks later, the claimant was not doing well, her hallucinations had increased, and she had increased feelings of paranoia" (*id.* at 29); "[t]he claimant underwent a separate psychiatric evaluation with a different provider on July 17, 2023, and reported worsening hallucinations since the passing of her mother in March" (*id.*); "[a]t a virtual visit a few months later, she had some improvement, but her hallucinations were worse at night and she had difficulty sleeping" (*id.*); "[a]t a follow-up in November of 2023, the claimant reported worsening hallucinations, weight gain, depression, and restlessness" (*id.*); "[h]owever, at a follow-up in February of 2024, the claimant reported not taking three of her medications. Her medication for her schizoaffective disorder, which she was taking, helped with her hallucinations." (*Id.*) The ALJ continued her analysis, writing:

> . . . She experiences paranoia, has auditory hallucinations (e.g., hearing voices telling her to hurt herself), and has tactile hallucinations. The hallucinations make it difficult for her to focus on tasks at work and at home (e.g., bathing, performing household chores) and needs encouragement to do these things. . . .If she sits down for too long or engages in an activity for too long (e.g., watching television or movies), she has tactile hallucinations. She lives with her stepbrother and stepfather and interacts with them; she testified that she does not have difficulty interacting with the public, but her other symptoms (e.g., jerking, shaking) have impacted her ability to interact with others.

(*Id*. at 30.) Here, the ALJ extensively considered Foley's hallucinations and paranoia throughout the RFC analysis. (*Id*. at 26-30.) The ALJ considered Foley's allegations, her parent's report, arguments of Foley's hearing representative, her daily activities, the nature of her symptoms, medications and side effects, and treatment. (*Id*.) In doing so, the ALJ considered several findings that undercut Foley's disability. *Miner v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1529(c)(3), 404.1571, 416.929(c)(3), 416.971)).

While Foley interprets the record differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton*, 246 F.3d at 772-73 (6th Cir. 2001).  In the Sixth Circuit an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003). It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.  While Foley would weigh the evidence differently, it is not for the Court to do so on appeal.

There is no error.

### VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: March 31, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**

31